UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROMICA MIHAESCU, individually and on behalf of all others similarly situated,<br>Plaintiff,<br><br>v.<br><br>VALE S.A., FABIO SCHVARTSMAN, MURILO PINTO DE OLIVEIRA FERREIRA, and LUCIANO SIANI PIRES, | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Romica Mihaescu ("Plaintiff"), by his attorneys, except for Plaintiff's own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Vale S.A ("Vale" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased Vale shares between April 11, 2017 and January 28, 2019, both dates inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's claims are asserted against the Company and certain of its executive officers.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Vale securities trade on the New York Stock Exchange ("NYSE"), located within this Judicial District.

## PARTIES

5. Plaintiff, as set forth in the attached Certification, purchased Vale securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

6. Defendant Vale together with its subsidiaries, produces and sells iron ore and iron ore pellets for use as raw materials in steelmaking in Brazil and internationally. It operates through Ferrous Minerals, Coal, and Base Metals segments. The Ferrous Minerals segment produces and extracts iron ore and pellets, manganese, ferroalloys, and others ferrous products and services, as well as engages in the provision of related railroad, port, and terminal logistics services. The Coal segment is involved in the extraction of metallurgical and thermal coal; and provision of related logistic services. The Base Metals segment produces and extracts nonferrous minerals, including nickel; and its by-products, such as ferro-nickel, cobalt, gold, silver, copper, precious metals, and others. The Company was formerly known as Companhia Vale do Rio Doce and changed its name

to Vale S.A. in May 2009. Vale was founded in 1942 and is headquartered in Rio de Janeiro, Brazil.

7. Defendant Fabio Schvartsman ("Schvartsman") has served as the Company's Chief Executive Officer ("CEO") since May 2017.

8. Defendant Murilo Pinto de Oliveira Ferreira ("Ferreira") served as the Company's President from May 2011 until May 26, 2017, and served as the Company's CEO from May 22, 2011 to May 22, 2017.

9. Defendant Luciano Siani Pires ("Pires") has served as the Company's Chief Financial Officer ("CFO") since August 1, 2012.

10. Defendants Schvartsman, Ferreira, and Pires are collectively referred to herein as the "Individual Defendants" where appropriate. By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of Vale's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

11. Vale has a history involving dam failure in connection with its mining activities. On November 5, 2015, Brazilian authorities reported that an iron-ore mine operated by Samarco Mineração SA ("Samarco") (jointly owned by Vale and BHP, another mining entity) burst, killing dozens of people and devastating the local community. The cause of the collapse was the failure of a tailings dam, used to hold water and discarded minerals from the nearby iron-ore mine.

12. The November dam burst resulted in Vale and BHP settling a civil suit with Brazilian public authorities for 20 billion real (US$5.3 billion) and additional fines to be levied in the future. Vale also agreed to community participation in decisions related to remediation and compensation programs and greater corporate compliance.

**Materially False and Misleading**
**<u>Statements Issued During the Class Period</u>**

13. The Class Period begins on April 11, 2017, when Vale filed its Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2016 (the "2016 20-F"). The 2016 20-F was signed by Defendants Ferreira and Pires and contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ferreira and Pires attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

14. The 2017 20-F stated, in relevant part:

> In May 2016, the state of Minas Gerais issued a decree ordering an immediate assessment of the stability conditions of the upstream dams and suspending new licensing procedures for building or heightening upstream dams, until the state environmental authority defined new rules and procedures. ***We have conducted extraordinary audits on the stability conditions of our upstream dams, and no anomalies were identified.*** We filed a report with local governmental authorities in September 2016. In March 2017, the state of Minas Gerais determined that upstream dams, or dams that have been once heightened by this method, that had

> their stability conditions attested by audit could be heightened by other constructive methods.

(Emphasis added).

15. The 2016 20-F also touted the Company's Governance and Sustainability Committee, which it touted as overseeing the various risks posed by the Company's operations, including, being responsible for "***evaluating proposals for modifying, analyzing and recommending improvements to our sustainability report***," and "***evaluating Vale's performance with respect to sustainability and recommending improvements based on our long-term strategic vision***". (Emphasis added.)

16. The Sustainability Report referenced in the 2016 20-F, entitled "Sustainability Report 2016", was touted by the Company as "a milestone for Vale, and marks the tenth anniversary of the publication, whose objective is to show stakeholders its achievements and difficulties, its challenges and advances, in the economic, social, and environmental spheres, in a demonstration of transparency and commitment to accountability to society."

17. In the Sustainability Report 2016, Defendants claimed that "Vale's commitment has always been to seek continuous improvement, using diagnostics as a basis for defining necessary policies, action plans and targets, promoting transformation towards excellence in sustainability."

18. The Sustainability Report 2016 specifically addressed the Company's "Dams under Control", stating in relevant part:

> ***In a demonstration of transparency and genuine concern with safety issues, Vale Fertilizantes structured Key Performance Indicators (KPIs) to broaden the dialogue on the issue, involving mainly neighboring communities and public security agencies.*** The measure, motivated by the growing demand for clarification regarding the safety of mining dams also boosted internal movement for the revision of risk analyses and emergency plans, in search of the continuous improvement of the process. The project's implementation process included:

- Identification, in Vale Fertilizantes operations, of structures that, in the event of failure accidents, leakage, or overflowing, may present a risk of significant material loss or loss of life;
- Mapping of communities that could be potentially affected by problems in each of the structures identified;
- Survey of participation need and service capacity of relevant local agencies;
- Updating the activities of Emergency Action Plans;
- Coordination of actions necessary to carry out the plans with the region's Civil Defense, Fire Department and/or Environmental Police;
- Operationalization of the Emergency Action Plans with each of the potentially affected communities.

> All this work marked the beginning of an ongoing dialogue that the Vale intends to maintain with communities and security agencies on the subject of dams. In 2016 there has been an approach and clarification of doubts. The expectation is that the communities involved (Araxá, Tapira, Uberaba, and Patos de Minas – MG; Catalão – GO; Cajati and Cubatão – SP; Rosário do Catete, Maruim, Santo Amaro das Brotas, and Barra dos Coqueiros – SE) continue increasingly well-informed and prepared to proceed in a possible dam accident.

(Emphasis added).

19. The Sustainability Report 2016 further asserted that "[a]t Vale, dedicated and qualified teams are assigned the responsibility of dam safety management. Vale aims to operate its dams using advanced engineering techniques, following strict controls, monitoring their performances in a systemic way, and evaluating safety conditions through annual external audits."

20. Discussing Vale's purported safety inspections of each of its current and former dams, the Sustainability Report 2016 stated, in relevant part:

> In addition to inspection and monitoring routines, they undergo periodic maintenance, such as the cleaning of drainage and overflow structures, weeding, recovery of small erosions, restoration of slope coverage, among others, in order to ensure adequate conservation conditions for good performance. At Vale, all dams, even if no longer in operation, remain under its responsibility and are monitored, audited, and maintained normally under the same criteria and safety levels adopted during their operation.

21. On April 13, 2018, Vale filed a Form 20-F with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2017 (the "2017 20-F"). The

2017 20-F was signed by Defendants Schvartsman and Pires and contained SOX certifications signed by Defendants Schvartsman and Pires attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

22. The 2017 20-F represented that the Company was committed to keeping its workplace safe and minimizing environmental damage especially in light of the disaster after the Fundão tailings dam in 2015. Specifically, the 2017 20-F stated, in relevant part:

> ***Commitment to sustainability***
> We are committed to becoming a sustainability benchmark through a comprehensive approach based on systematic planning and execution, prioritizing risk and impact management (seeking to achieve zero harm to our employees and surrounding communities) and establishing a positive social, economic and environmental legacy in the places where we operate. Below is a list of measures illustrating our commitment to sustainability:
>
> - Since 2013, environmental and social actions are directly incorporated into our strategic planning. In 2017, we joined the International Council on Mining and Metals (ICMM), the most important association in the mining industry, reaffirming our commitment to sustainable development. Also in 2017, we joined the Task Force on Climate-related Financial Disclosures (TCFD). The purpose of the TCFD is to create a set of recommendations to improve the quality of voluntary disclosure of climate-related information.
>
> - We are committed to reducing water use in our activities by investing in technologies and initiatives to control total water withdrawal, especially by promoting water reuse. In 2017, we withdrew a total of 276.3 billion liters of water, and used 179.5 billion liters in our operations (including discontinued operations), with the balance being allocated to third parties. From the total volume of water used in 2017, 83% or 148.9 billion liters was reused.
>
> - We are committed to improving the health and safety of our workers. Our total recordable injury frequency performance in 2017 was 2.0 per million hours worked, slightly higher than the frequency of 1.89 per million hours worked recorded in the previous year, although demonstrating a 24% improvement over the last five years.
>
> - We follow standards for social action in accordance with international guidelines, including principles on business and human rights, which are

based on the Guiding Principles on Business and Human Rights of the United Nations Human Rights Council.

- In July 2016, we, together with Samarco and BHPB, established the Fundação Renova to develop and implement remediation and compensation programs over many years, in order to support the recovery of the areas and communities affected by the failure of Samarco's dam.

23. The 2017 20-F touted the methods purportedly employed by Vale to monitor and inspect its dams pursuant to Brazilian mining and environmental regulations, stating in relevant part:

> ***Brazilian regulation of mining dams.*** In May 2017, the DNPM (predecessor to the ANM) created new obligations for companies operating mining dams in Brazil, primarily:
>
> - *Audit*: Companies operating mining dams must conduct two annual stability audits for each dam and prepare a stability condition report. Specifically in the State of Minas Gerais, these audits and reports must be prepared by external auditors.
>
> - *Periodic Safety Reviews*: The stability condition report must include detailed analysis of all dam's documentation impacts on surrounding communities, including hazards and failure impact studies. Companies operating mining dams classified as high associated potential damage (DPA) must complete these studies by June 2018, while those for medium-DPA mining dams must be completed by December 2018 and those for low-DPA mining dams must be completed by June 2019.
>
> - *Emergency Action Plan Training*: Companies operating high-DPA mining dams must conduct two annual emergency action plan training sessions for their employees.
>
> - *Monitoring*: Video monitor must be implemented for all high-DPA mining dams by June 2019.

24. On May 30, 2018, Vale filed a Form 6-K with the SEC, further detailing the methods employed to monitor and inspect its dams under Brazilian mining and environmental regulations, stating, in relevant part:

- Brazilian regulation of mining dams. In May 2017, DNPM (predecessor of ANM) created new obligations (Ministerial Order DNPM n[degree] 70.389/2017) for companies that operate mining dames in Brazil, mainly:

    - *Audit:* Companies that operate mining dams must conduct two annual audits (March and September) for each dam that falls within the National Dams Security Policy (PNSB), with the issuance of the respective Stability Condition Statement (DCE), and the September audit must be carried out by an external consultant . . . .

    - *Periodic Dam Safety Review (RPSB)*: The RPBS shall submit a report containing the detailed and adequate inspection of the dam, the reassessment of existing projects, the performance of new stability analyzes as well as their category of risk and damage potential, associated with the updating of hydrological studies, reassessment of operating procedures, maintenance, instrumentation and monitoring tests, reassessment of operating procedures, maintenance, instrumentation and monitoring tests, reassessment of PAEBM (when applicable), and issuance of a Stability Condition Statement (DCE). Companies operating mining dams classified as Associated Potential Damage (DPA) should complete these studies by June 2018, while studies of average DPA mining dams should be completed by December 2018 and those of mining dams Low DPA should be completed by June 2019.

- *Emergency Action Plan Training*: Companies operating high DPA mining dams should conduct internal training at most every six months and maintain records of activities.

25. The 2016 20-F also touted the Company's Sustainability Committee, and enumerated its ostensible responsibilities, including:

> (i) evaluating Vale's sustainability strategy, and ensuring that it is considered when setting overall strategy; (ii) ***evaluating Vale's policies and conduct related to Safety, the Environment, Health, Social Actions, Communication and Institutional Relations***; (iii) evaluating Vale's performance regarding sustainability aspects and proposing improvements based on a long-term vision; (iv) ***aiding in setting, evaluating and monitoring the company's sustainability indicators and proposing improvements***; (v) ***evaluating and proposing Vale's adherence to national or international initiatives or agreements related to socio-environmental responsibility matters, and monitoring the preparation and disclosure of the sustainability report***…"

(Emphases added).

26. The 2017 20-F also referenced the 11th edition of Vale's Sustainability Report, entitled "Sustainability Report 2017." The 2017 Sustainability Report purportedly "present[ed] Vale's main actions and results in the period, including financial and non-financial information related to the company's economic, environmental and social performance."

27. In the Sustainability Report 2017, Defendant Schvartsman touted Vale's environmental focus and sustainability advancements, stating, in relevant part:

> In 2017, [the Company] invest[ed] US$ 612 million in the social and environmental area. ***However, for Vale, sustainability extrapolates numbers and figures. It permeates our decision-making process so that we can contribute effectively to society***, rewarded the right we have been granted to prosper through mining.
>
> In 2017, this notion materialized into a series of initiatives, in and out of Vale internally, ***we carried out a deep review of our structure***, implementing several changes, among which we highlight the creation of the Sustainability and Institutional Relations Executive Office, giving focus, priority and character to the subject.
>
> * * *
>
> I am proud of how much we advanced in 2017, and I am sure we can go even further, but there are big and important challenges ahead. Despite our efforts, we are sorry for the five deaths in our operations, and we are solidary to these families. ***Zero Harm is a priority for Vale. In this sense, we have strengthened our commitment to continue the actions to mitigate the consequences of the breakup of the Fundão dam, Mariana, in the state of Minas Gerais.***

(Emphases added).

28. The Sustainability Report 2017 also stated, in relevant part:

> The largest mining company in the Americas and one of the largest in the world, ***Vale's purpose is transforming natural resources into prosperity and sustainable development through mining.*** This means working with the goal of generating economic return for shareholders and, at the same time, ***adopting best practices to protect the environment*** and of social action.

(Emphasis added).

29. The Sustainability Report 2017 also touted the training Vale's employees received in sustainability and safety practices, expounding on the Company's vast culture of industry and environmental safety. For example, under its "Career and succession" section, the Sustainability Report 2017 stated, in relevant part:

> Vale's educational strategy is dedicated to developing and qualifying its professionals. This is achieved through a portfolio of training and qualification exercises, through which employees reinforce the skills they require to perform their activities, whether they be technical, managerial, leadership, or transversal (related to health and safety, the environment, respect for diversity, among others).
>
> In 2017, Vale invested approximately 3.6 million hours in the training of its employees around the world. Investments in training totaled US$14 million and were allocated to employee development in Africa, Asia, Europe and Americas. To reinforce Life Matters Most corporate value, the company maintains training and development initiatives specifically related to Health and Safety. During the year, more than 537 thousand hours are devoted to H&S training, such as our Accident Victim Assistance Group, Integrated Health, Safety and Environment Management, Hearing Protection Program, Respiratory Protection Program and Personal Equipment Protection (PEP).
>
> One of the topics that drives trade union entities and collective agreements is the dissemination of a Health and Safety culture associated with the challenge of achieving Zero Harm. Vale considers employee representatives' concerns and points of view in defining mechanisms and requirements to prevent occupational accidents and diseases, and respects local regulations and legislation. It promotes training on the use of machines and equipment, provides Personal Protective Equipment, conducts periodic surveys in Vale's operational areas, and maintains joint Health and Safety committees. Employees have the right, guaranteed and reinforced by internal policies, to refuse unsafe work.

30. The Sustainability Report 2017's "Policies and commitments" section highlighted Vale's system for integrating its sustainability policy, stating, in relevant part:

> A key tool for effectively implementing the Sustainability Policy is Integrated Management System (IMS), which outlines processes to minimize impacts and risks to the environment, safety, health and quality in their respective processes. In addition, by defining roles and responsibilities, and providing guidelines and criteria, the to helps us achieve Sustainable Development Goals. It also continuously improves the company's environmental and healty and safety performance, using the the PDCA (Plan – Do – Check – Act) approach.

31. Particularly, in its "Dam and mineral residues management" section, the Sustainability Report 2017 stated, in relevant part:

> ***Vale maintains the management of its dams in permanent alignment and updating with the good and strictest international practices, standards of which exceed the legal requirements. In this sense, it bears emphasizing that the Brazilian dam safety legislation is quite stringent, also based on good international practices and very judicious, both in terms of safety management requirements and emergency management.***
>
> In general, society's knowledge and legislation advance at the pace of events and learning. ***With respect to dams, Vale is dedicated to advancing the dam safety movement and has contributed in a transparent manner to discussions at several forums, whether technical, legislative or civil society in general.***
>
> Among the international standards used as reference, we highlight the guidelines of the International Committee of Large Dams (ICOLD) and the Mining Association on Canada (MAC). ***International specialists and external auditors recognize Vale as a model for risk management in the global industry.***
>
> ***The strictness adopted is a demonstration of the our understanding that efficient dam management is a vital aspect not only for for [sic] Vale operations and its workforce, but also for the communities surrounding these structures.***
>
> In the Ferrous area [i.e., metals containing or consisting of iron—the Minas Gerais dam was in connection with iron mining], Vale's Integrated Risk Management System for geotechnical structures is based on three main pillars: People, Processes and Information Systems. In the People pillar, specialized teams are dedicated to controlling Vale's dams, deploying qualified professionals at the operation sites to take care of the structures day-to-day, and at the offices to develop projects, studies and analyses to assure safety and reduce structural risks.
>
> In the Processes pillar, procedures are organized in Safety Management, Risk Management and Emergency Management throughout the life cycle of the structure, from design implementation, operation, maintenance and monitoring. In all these phases, the prognosis of the risks and the state of our readiness in case of an emergency.
>
> In the Information Systems pillar, the Ferrous area has two systems that support geotechnicians with information for fast and effective decision-making. One of them is Geotec, which stores structural maintenance and monitoring data. The other is Geotechnical Risk Management (CRG, acronym in Portuguese), which stores technical information on the structures, the Dam Safety Plan and information on risk analyses.

***In addition to applying best practices pertaining to dam safety management, Vale submits its structures to audits conducted by specialized external consultants, and rigorously complies strictly with applicable legislation.*** Another highlight this year was implementing the International Panel of Experts on the Ferrous area, composed of international and national technicians who work in risk management, geotechnics and water resources. The panel's purpose is to evaluate governance, processes, studies, projects and technical analyses of geotechnics and hydrology.

**Managed structures**

The Ferrous area, responsible for managing iron ore dams in Brazil, closed 2017 with 150 dams and dikes designed to contain tailings, sediments and water.

* * *

**Investments**

In 2017, the Iron Ore Department dedicated approximately US$182 million to managing all of its dams. The resources were invested in maintenance, monitoring, improvement works, audits, risk analyses, revisions to the Mining Dams Action Plans for Emergencies (MDAPE) and warning systems implementation, among other services. The company has also been developing a structure automation project, which includes signage and lighting improvements, video monitoring and automated instrumentation of its structures. These actions are expected to be completed by 2019 and fulfill the requirements of the Brazilian legislation, National Department of Mineral Production (DNPM, acronym in Portuguese) Ordinance 70,389/17, and current National Mining Agency (ANM, acronym in Portuguese).

* * *

**External audits and inspections**

***In 2017, external audits were carried out on 107 structures in the Ferrous area, located in Brazil. All of them had their physical and hydraulic stability certified, and were issued Statements of Stability Condition (DCE, acronym in Portuguese) by the responsible auditors.*** Also in 2017, Vale hosted three meetings of the Panel of Experts.

However, seven official notifications were received from the National Department of Mineral Production (DNPM, acronym in Portuguese) regarding Vale's management of Ferrous area dams. These notifications refer to the company's compliance with legal requirements. Five of them, however, lack actual legal grounds, so Vale does not recognize them and is appealing the matter. The other two refer merely to formal errors regarding the completion of the SIGBM (Mining Safety Integrated Management System for Mining Dams) system, so the company

> decided to pay the corresponding fine. It should be noted that none of these notifications are related to the hydraulic and physical safety of the structures.

(Emphases added).

32. In its "Dam and mineral residues management" section, the Sustainability Report 2017 stated, in relevant part:

> In operating the Iron Ore Department in Brazil, 18 municipalities are within the self-rescue zone, the region in which accident warnings are the responsibility of the company rather than the competent authorities. Of these, 16 are in Minas Gerais, one is in Mato Grosso do Sul, and one is in Pará. The estimated population in the first seven kilometers downstream of the dams, in the direction of the current, consists of approximately 20 thousand people in the flood stain area.
>
> In compliance with Federal Law no. 12,334 and DNPM regulations 416/2012 and 526/2013, both replaced by DNPM n. 70.389 / 2017, Vale has filed since 2015 the Mining Dam Emergency Action Plans (PAEBM, acronym in Portuguese) referring to its structures. Since then, it has maintained an intense process for identifying opportunities for improvement, which is reflected in periodic updates with a new version filed in 2016, and current work to revise the file in the first half of 2018.
>
> The company maintains a permanent and joint project with the Civil Defense Coordinator's Offices of these municipalities, to assure these plans' effectiveness. In 2016 and 2017, contact was maintained with the communities of all the mapped areas, which made visible the context of coexistence with the dams.
>
> The project also implemented a survey to collect information, enabling the creation of emergency maps detailing escape routes, muster stations and alert system implementation.
>
> Plans for the orderly return to communities were also started, to present these plans in an integrated manner that will enable drills to perform in 2018. Thus, we consolidated an emergency operational routine to assure all agents are properly qualified and readied, including employees and the community. ***These actions are preventive, as all the structures in the Ferrous area are completely normal and stability-certified by the audit completed in September 2017.***

(Emphasis added).

33. Finally, the Sustainability Report 2017 included a signed statement by SGS ICS Certificadora Ltda. ("SGS"), which was "hired by Vale S.A. to render independent assurance of

its Sustainability Report 2017." SGS' statement incorporated into the Company's report sought to allay potential investor concerns by touting its purportedly robust assurance process:

> The assurance process suggested by VALE S.A., and deemed as innovative by SGS, has comprised a combination of (i) visits to VALE business unit where the indicator, data and process concerning to sustainability and collection of GRI indicators were reviewed, and the interviews with key personnel were carried out and the operational process were followed up, (ii) reviews of documents submitted by VALE S.A and crosschecking with information placed by company on indicators system – Credit 360 and (iii) review of the issues of the said report in order to align them with GRI standards.

34. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Vale had failed to adequately assess the risk and damage potential of a dam breach at its Feijão iron ore mine especially in light of its experience in 2015; (ii) Vale's programs to mitigate health and safety incidents were inadequate; (iii) Defendants filed to disclose that Vale's auditor was not independent, as required under Brazilian mining law; (iv) Defendants failed to disclose that an internal report commissioned by Vale in 2018 to assess the stability of the tailings dam raised concerns over its drainage and monitoring systems; (v) Defendants failed to disclose the existence of information that the dam was at risk of "liquefaction," the same issue that led to the 2015 collapse of the Samarco dam; and (vi) as a result, Vale's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

35. On January 25, 2019, *Reuters* reported that Vale's tailings dam had burst at its Feijão iron ore mine. A "torrent of sludge tore through the mine's offices, including a cafeteria during lunchtime."

36. On this news, shares of Vale fell $1.20 per share or over 8% to close at $13.66 per share on January 25, 2019.

37. Then, on January 26, 2019, *BBC News* reported that hundreds of people affected by the dam's breach remained missing, in part because the dam's alarm system failed at the time of the accident. A report by a Folha de S. Paulo newspaper stated "the risk of collapse of the dam had been mentioned in a 'tense meeting' that approved its license last month[.]"

38. That same day, *Reuters* reported that Brazil's National Mining Agency ordered Vale to suspend operations at its Corrego de Feijão iron ore mining facility as a result of the dam burst. The article also stated that "State prosecutors . . . [seek] $1.3 billion [] in Vale's accounts for handling damages . . . adding that [prosecutors] expect[] more funds to be frozen in the future."

39. On January 28, 2019, *Reuters* reported "Brazil's top prosecutor said on Monday she will pursue criminal prosecutions after the collapse of a tailings dam operated by mining giant Vale SA killed at least 58 people and left hundreds missing, and that executives may be punished."

40. That same day, *Reuters* reported that "Brazilian securities industry regulator CVM has opened a probe into miner Vale SA's filings related to a burst tailings dam in the town of Brumadinho[.]"

41. On this news, shares of Vale plunged by $2.46 per share, or approximately 18%, to close at $11.20 per share on January 28, 2019.

42. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**ADDITIONAL EVIDENCE OF SCIENTER**

43. On February 6, 2019, the *Wall Street Journal* reported report that the Company was in possession of a detailed report ***written months before the disaster*** indicating that the dam was not certifiable:

> Inspectors of a Brazilian mining-waste dam whose collapse last month killed at least 150 people had warned its owner that faulty water drainage and monitoring systems represented a potential risk of failure, according to a safety report reviewed by The Wall Street Journal.
> The report, provided to the mine's owner Vale SA months before the disaster, found that flaws in monitoring crucial water concentrations and drainage made it difficult for the company to fully assess the dam's stability.
>
> TÜV SÜD, the company that inspected the dam and wrote a 128-page report for Vale in September, ultimately certified the dam as stable. But two independent mining dam experts who reviewed the report with the Journal said the dam shouldn't have been certified and Vale should have recognized potential risks.

44. Then on February 7, 2019, the *Wall Street Journal* reported that "[a] safety auditor who inspected a Vale SA mine-tailings dam that collapsed in January killing at least 150 people told police he felt pressured to attest to its stability, despite indications it was unsafe, because he feared losing business with the company, according to court documents seen by The Wall Street Journal."

45. The article went on to state the following, which evidences Defendants' knowledge that their attestations that the Company was in compliance with the law were false:

> The safety auditor, Makoto Namba, a 62-year-old civil engineer employed by German inspection company TÜV SÜD, told police that Vale knew there were problems with the dam, according to the court documents. Mr. Namba said he told Vale that water was leaking into the reservoir behind the dam, and that its drainage system was insufficient.
>
> ***
>
> Mr. Namba told police that Vale should have relocated the canteen and offices on the site as they were directly beneath the dam and potentially in danger, according to the court documents.

***

> When TÜV SÜD attested to the dam's safety in a report in September, it also detailed a number of factors that mining experts said should have raised red flags about the overall safety of the dam at Vale, largely related to the dam's drainage and how much water was in the tailings collected by the dam.
>
> In TÜV SÜD's report, which was reviewed by the Journal, the auditor recommended that Vale repair damage to drainage systems in certain parts of the dam. Some of the water-drainage tubes and channels had been clogged by vegetation or damaged by cows trampling over the site.

***

> Mr. Namba said he signed off on the safety of the dam on the promise that Vale would follow TÜV SÜD's recommendations. According to the court documents, Mr. Namba said that a technical director at Vale told him, "Is TÜV SÜD going to sign this safety declaration or not?"
>
> Mr. Namba told police he felt that comment was a "way to pressure Mr. Namba and TÜV SÜD to sign the safety declaration or risk losing the contract." Mr. Namba told police he started working for TÜV SÜD when it acquired a Brazilian consulting firm where he had worked for two decades.
>
> Emails exchanged between Vale and TÜV SÜD just days before the dam collapsed showed that Vale was also aware of potential problems with the sensors at the dam, according to the documents.
>
> Mr. Namba told police that if those problems with the sensors were confirmed, and his own son were working at the facility, he would have called him immediately and told him to flee, according to the documents.

46. Accordingly, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal common stock laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Vale, their control over, and/or receipt and/or modification of

Vale's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Vale.

**LOSS CAUSATION**

47. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Vale's shares and operated as a fraud or deceit on Class Period purchasers of Vale shares by materially misleading the investing public. Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Vale's shares fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Vale shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal common stock laws.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

48. At all relevant times, the market for Vale's shares was an efficient market for the following reasons, among others:

(a) Vale's shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) Vale filed periodic public reports with the SEC; and

(c) Vale regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

49. As a result of the foregoing, the market for Vale's shares promptly digested current information regarding Vale from all publicly available sources and reflected such information in the

prices of the shares. Under these circumstances, all purchasers of Vale shares during the Class Period suffered similar injury through their purchase of Vale shares at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

50. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Vale who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Vale shares during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable, since Vale has millions of shares outstanding and because the Company's shares were actively traded on the NYSE. As of February, 2018, Vale had more than 1.24 billion shares issued and outstanding. While the exact number of Class members in unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

53. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

(a) whether the Exchange Act was violated by Defendants;

(b) whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

(c) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

(e) whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

(f) whether the price of Vale shares was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of Vale's shares when the truth was revealed, and if so, what is the appropriate measure of damages.

54. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

55. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants)

57. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

58. This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

59. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vale's shares; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Vale's shares at artificially inflated prices. In furtherance of this

unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

60. Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's shares in an effort to maintain artificially high market prices for Vale's shares in violation of Section 10(b) of the Exchange Act and Rule 10-5.

61. As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded shares would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

62. Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class. Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

63. As a result of Defendants' fraudulent activity, the market price of Vale was artificially inflated during the Class Period.

64. In ignorance of the true financial condition of Vale, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Vale containing the misleading information, purchased or otherwise acquired Vale's shares at artificially inflated prices during the Class Period.

65. Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Vale's scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased Vale's shares in reliance on the integrity of the market price of those shares, and Defendants manipulated the price of Vale's shares through their misconduct as described herein. Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Vale.

66. Throughout the Class Period, Defendants were aware of material non-public information concerning Vale's fraudulent conduct (including the false and misleading statements described herein). Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

67. As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Vale shares during the Class Period.

## COUNT II
## Violation of Section 20(a) of the Exchange Act
## (Against the Individual Defendants)

68. Plaintiff incorporates by reference and re-alleges each and every allegation above as though fully set forth herein.

69. During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

70. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

71. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Vale's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made or directed the making of affirmative statements to financial analysts and the investing public at large, and participated in meetings and

discussions concerning such statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading. As a result, the Individual Defendants are responsible for the accuracy of Vale's corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

72. The Individual Defendants acted as controlling persons of Vale within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Vale to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Vale and all of its employees. As alleged above, Vale is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b5. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

73. As a direct and proximate result of the wrongful conduct of Vale and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class and his counsel as Class counsel;

B. Awarding Plaintiff and the members of the Class damages, including interest;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 20, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Jonathan D. Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
ahood@pomlaw.com
jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com

***Attorneys for Plaintiff***